70 A.3d 524

BOROUGH OF HARVEY CEDARS, PLAINTIFF–APPELLANT, v. HARVEY KARAN AND PHYLLIS KARAN, TENANTS IN COMMON, DEFENDANTS–RESPONDENTS.

Argued May 13, 2013—Decided July 8, 2013.

*Lawrence H. Shapiro* argued the cause for appellant (*Ansell Grimm & Aaron,* attorneys).

*Peter H. Wegener* argued the cause for respondents (*Bathgate Wegener & Wolf,* attorneys).

*Christopher S. Porrino,* Assistant Attorney General, argued the cause for amicus curiae Department of Environmental Protection (*Jeffrey S. Chiesa,* Attorney General of New Jersey, attorney; *Mr. Porrino, David S. Frankel,* Deputy Attorney General, and *Dean Jablonski,* Assistant Attorney General, on the brief).

*David C. Apy* argued the cause for amicus curiae The Jersey Shore Partnership (*Saul Ewing,* attorneys).

Justice ALBIN delivered the opinion of the Court.

When a municipality takes private property for a public use, the property owner is entitled to "just compensation" under our State and Federal Constitutions. *N.J. Const.* art. I, ¶ 20; *N.J. Const.* art. IV, § 6, ¶ 3; *U.S. Const.* amend. V. In this case, as part of a massive public-works project, the Borough of Harvey Cedars exercised its power of eminent domain to take a portion of the beachfront property of Harvey and Phyllis Karan to construct a dune that connects with other dunes running the entire length of Long Beach Island in Ocean County. The dunes serve as a barrier-wall, protecting the homes and businesses of Long Beach Island from the destructive fury of the ocean.

That the Karans are entitled to "just compensation" for the taking of a portion of their property for this public project is not in question. Instead, the focus here is on how to calculate "just compensation" when the taking of a portion of the property for a public project may lessen in part and enhance in part the value of the remaining property.

At a condemnation trial, the court permitted the Karans to introduce evidence of the loss in value to their home caused by the dune obstructing their oceanfront vista. The trial court, however, denied Harvey Cedars the opportunity to show that the dune enhanced the value of the Karans' property by protecting it from the damage and destruction that is wrought by powerful storms and ocean surges. Based on our state-law jurisprudence, the court determined that only special benefits, not general benefits, flowing from a public project can be considered in calculating the enhanced value to the remaining property. In the court's view, the storm protection afforded by the project is a general benefit because the dunes not only protect all property owners in Harvey Cedars but also presumably add value to their property. Accordingly, the court did not allow the jury to consider evidence that the dunes—constructed at public expense to protect the island's homes from minor and catastrophic storms—enhanced the value of the Karans' property. The jury awarded the Karans $375,000 in

damages, premised mostly on the loss of their oceanfront view. The Appellate Division affirmed. *Borough of Harvey Cedars v. Karan*, 425 *N.J.Super.* 155, 167–68 (App.Div.2012).

We now conclude that when a public project requires the partial taking of property, "just compensation" to the owner must be based on a consideration of all relevant, reasonably calculable, and non-conjectural factors that either decrease or increase the value of the remaining property. In a partial-takings case, home-owners are entitled to the fair market value of their loss, not to a windfall, not to a pay out that disregards the home's enhanced value resulting from a public project. To calculate that loss, we must look to the difference between the fair market value of the property before the partial taking and after the taking. In determining damages, the trial court did not permit the jury to consider that the dune would likely spare the Karans' home from total destruction in certain fierce storms and from other damage in lesser storms. A formula—as used by the trial court and Appellate Division—that does not permit consideration of the quantifiable benefits of a public project that increase the value of the remaining property in a partial-takings case will lead to a compensation award that does not reflect the owner's true loss. Compensation in a partial-takings case must be "just" to both the landowner and the public. *United States v. Commodities Trading Corp.*, 339 *U.S.* 121, 123, 70 *S.Ct.* 547, 549, 94 *L.Ed.* 707, 712 (1950). A fair market value approach best achieves that goal.

Because that approach was not followed in this case, we reverse the judgment of the Appellate Division and remand for a new trial.

I.

*The Beach- and Storm-Protection Project*

The backdrop to this case is a beach-restoration and storm-protection project on Long Beach Island funded by federal, state, and local governments. This massive public project—carried out by the U.S. Army Corps of Engineers and the New Jersey

Department of Environmental Protection—provides vital protection to the island's residents from beach erosion and storms that threaten homes and businesses with damage and destruction. One part of the project involves the pumping of massive amounts of sand onto the beach to extend the shoreline seaward by 200 feet. Another part involves beach nourishment every seven years over a period of fifty years to battle beach erosion. The last part of the project calls for the construction of dunes along the entire length of the island sufficient to hold back storm-triggered waves capable of destroying or seriously damaging homes and businesses. The dune seaward of the Karans' property is designed in the form of a trapezoid—twenty-two feet high and thirty feet wide at the top—and was built to replace an existing sixteen-feet-high dune.

The dune-construction project required the securing of easements on properties bordering the ocean.[1] The responsibility and cost of acquiring those easements fell to the municipalities on Long Beach Island. One such municipality is the Borough of Harvey Cedars.

The Borough's obligation was to secure eighty-two perpetual easements over the portions of private beachfront properties closest to the ocean on which the dunes would be built. The Borough acquired sixty-six easements by voluntary consent of the property owners. However, the owners of sixteen beachfront properties, including the Karans, did not consent. As a result, in July 2008, the Borough adopted an ordinance authorizing it to

---

[1] A holder of an easement has a non-possessory interest in another person's land, *Leach v. Anderl*, 218 *N.J.Super.* 18, 24, 526 A.2d 1096 (App.Div.1987)—the holder has "the right to use someone's land for a specified purpose," *Long Beach Unified Sch. Dist. v. Dorothy B. Godwin Living Trust*, 32 *F.*3d 1364, 1368 (9th Cir.1994) such as to lay "pipelines or cable under or over another's land," 2–5 *Nichols on Eminent Domain* § 5.07(2)(a) (Matthew Bender, 3d ed. 2013), or in this case, to build and maintain a dune. The terms of the easement here deprived the Karans of the use and enjoyment of the land covered by the dune.

acquire easements over those sixteen properties through its statutory powers of eminent domain. *See N.J.S.A.* 20:3–1 to 50.

The Borough and the Karans could not agree on a figure representing just compensation for a perpetual dune easement over the seaside portion of their property. The Karans rejected the Borough's offer of $300 as compensation for both the land taken and any devaluation of the remaining property.

### The Karans' Property

The Karans' single-family, beachfront home sits on 11,868 square feet of land in Harvey Cedars. Constructed in 1973, the house is anchored on pilings and has three stories, with the upper two floors containing the dining and living quarters. These two floors open onto exterior decks, which had provided a panoramic view of the beach and ocean. The first level consists of a two-car garage and storage area for the heater, HVAC, and utility equipment.

To construct the twenty-two-foot dune, the Borough sought a perpetual easement over a strip of 3,381 square feet of the Karans' land nearest to the ocean. The easement covers more than one quarter of the Karans' property. The Karans claim that the newly constructed dune, standing between their home and the ocean, obstructs their view of the beach.

### The Eminent Domain Action

In November 2008, the Borough instituted an action in the Superior Court, Law Division to acquire by eminent domain an easement over the Karans' property. In an April 2009 order, the trial court adjudged that the Borough had exercised its eminent-domain powers to acquire part of the Karans' property and appointed three disinterested commissioners to "fix and determine the compensation to be paid."[2] The commissioners issued a

---

[2] *N.J.S.A.* 20:3–12(b) provides: "Upon determination that the condemnor is authorized to and has duly exercised its power of eminent domain, the court shall appoint 3 commissioners to determine the compensation to be paid by reason of the exercise of such power."

report that set an amount of just compensation for the partial taking of the Karans' property. The Karans rejected the commissioners' award and demanded a jury trial.

*First Rule 104 Hearing*[3]

Before trial, the Karans moved to bar any testimony from the Borough's expert, Dr. Donald M. Molliver, Ph.D., concerning storm-protection benefits afforded by the dune that increased the value of the Karans' home. The Karans argued that the storm-protection project provided "general benefits" to all Harvey Cedars property owners—to some greater or lesser degree—and therefore was not admissible as an offset against the value of the loss caused by the partial taking of their property. The trial court concluded that whether the dune constituted a special or general benefit was a fact issue to be decided by the jury.

*Second Rule 104 Hearing*

Closer to trial, before a newly assigned judge, the Karans moved for reconsideration of the earlier decision to submit the issue of special versus general benefits to the jury. The court concluded that only a consideration of special benefits, not general benefits, should go to the jury. But first, the court would have to decide as a matter of law whether the benefits derived from the dune were special or general. In accordance with its evidential gatekeeping role, the court took testimony to resolve the issue.

At the *Rule* 104 hearing, the Borough presented expert testimony from Randall A. Wise of the Army Corps of Engineers, a civil engineer specializing in coastal engineering. Wise explained that he had been assigned the task of assessing the storm-damage-reduction benefits that the dune project would provide to Harvey Cedars' oceanfront properties. Wise emphasized that certain storms would cause damage to frontline properties but not to

---

[3] *N.J.R.E.* 104(a) provides: "When ... the admissibility of evidence ... is subject to a condition, and the fulfillment of the condition is in issue, that issue is to be determined by the judge.... The judge may hear and determine such matters out of the presence or hearing of the jury."

properties further from the ocean. Risk of storm damage drops significantly the further a property is from the ocean, a point Wise dramatically made using a statistical analysis. Over a thirty-year period, without the dune-construction project, the chance of a storm "totally" damaging the Karans' frontline home was 56%. For the second-line home, the risk was 37%, for the third-line home 24%, and for the fourth-line home 1%. Thus, without the dune project, the Karans' property would likely suffer catastrophic storm damage sometime within thirty years, whereas with the project, it would likely be spared for a period of 200 years or greater. Without the dune project, the Karans' property had only a 27% chance of surviving fifty years without any storm damage. Wise stated that the costly public project was intended to provide storm protection to all property owners on Long Beach Island, not just those living in Harvey Cedars, and not just first-line property owners like the Karans. The economic feasibility of the project was based on benefits accruing to the island as a whole.

Based primarily on Wise's testimony, the court concluded that the financial benefits of the beach-replenishment and storm-protection project were shared—even though in differing degrees—by the larger community of Harvey Cedars and therefore were general benefits. The court pointedly stated that merely because "differing property owners enjoy the benefit to differing degrees does not convert a general benefit into a special benefit."

In support of that proposition, the court referred to *Sullivan v. North Hudson County Railroad Co.*, 51 *N.J.L.* 518, 18 *A.* 689 (E. & A.1889), a case involving an eminent-domain action in which a railroad acquired an easement over a landowner's property. *Id.* at 519–20, 18 *A.* 689. The trial court deduced from *Sullivan* that benefits enjoyed by the Karans from the construction of the dune that were likewise enjoyed " 'in greater or less degree' " by their neighbors were general benefits not to be weighed by the jury, quoting *id.* at 540, 18 *A.* 689. Based on its reading of *Sullivan,* the court deemed special benefits to be those that "directly increase[ ] the value of particular tracts" as opposed to those that

advantage "the whole community or neighborhood." The court also turned to *Richardson v. Big Indian Creek Watershed Conservancy District*, 181 *Neb.* 776, 151 *N.W.*2d 283, 286 (1967), for support, noting that the Nebraska Supreme Court defined general benefits as those arising " 'from the fulfillment of the public object which justified the taking,' " quoting *ibid.*[4] Here, the court indicated, the public project was intended to provide storm protection to the entire community. Reasoning that the dune-protection project was not a special benefit accruing to the Karans, the court barred the presentation of such evidence in valuing their property.

### The Trial

At the condemnation trial, a jury was impaneled to determine "just compensation" for the partial taking of the Karans' property. The Borough's civil engineer, Frank Little, provided background information about the beach-replenishment and storm-protection project on Harvey Cedars. The cost of the project was approximately twenty-five million dollars, with the Borough bearing approximately one million dollars of the cost, the State approximately seven-and-one-half million dollars, and the federal government the balance. In 2010, the Army Corps of Engineers completed a twenty-two-foot-high dune east of the bulkhead line of the Karans' property—the portion of the property on which, by law, no construction is permitted. The new dune replaced a dune approximately sixteen-feet high. The old dune was considered vulnerable and ineffective. Little noted that, in 1992, a winter storm damaged eighty oceanfront homes, totally destroying three, which set in motion a state-funded beach replenishment program. Under the current project, the dunes are to be maintained by the Army Corps of Engineers every five to seven years.

The Borough and the Karans each presented real estate appraisers as expert witnesses. The two appraisers both agreed that the value of the Karans' oceanfront home was 1.9 million

---

[4] This definition of general benefits does not find support, generally, in our case law.

dollars before the Borough acquired the easement in November 2008. Both generally agreed on the methodology for determining just compensation for the partial taking of a portion of the Karans' property—the value of the property before the taking of the easement subtracted from the value of the property after the easement and construction of the twenty-two-foot-high dune. Both utilized the comparative-sales approach—that is, comparing the Karans' property to other similar properties in the area that have been valued or sold. Nevertheless, the two appraisers came to widely divergent valuations of the Karans' property after the partial taking.

In accordance with the court's ruling, the Borough's appraiser, Dr. Molliver, did not refer to any financial benefits accruing to the Karans' home from the construction of the twenty-two-foot dune. Dr. Molliver opined that the value of the Karans' home did not change with the acquisition of the easement and the construction of the dune. He reached this conclusion because he found that the Karans' view was not blocked: "They could still see the ocean. They have an expanded beach. There's a panoramic view standing from the decks on the second and third levels." Although Dr. Molliver agreed that the view was the key valuation issue in the case, he never visited the Karans' deck after the dune construction. Dr. Molliver determined that the Borough's taking of 3,381 square feet of the Karans' property had a *de minimis* value of only $300.

Robert Gagliano, the Karans' real estate appraiser, opined that the obstruction of the Karans' view of the beach by the dunes—even though an ocean view remained—decreased the market value of the home by approximately twenty-five percent. He valued the loss of view at $500,000 based on a comparative-sales analysis of other oceanfront properties and suggested that the presence of the dune, in effect, converted the Karans' home into a second-row home where there are partially obstructed views of the ocean.

Harvey Karan testified that his home was built on pilings in 1973 and, since that time, he had not had "a lick of water" invade

the living quarters of his home. He explained that before con-
struction of the twenty-two-foot dune, while sitting on his deck, he
could see his children and later his grandchildren play on the
beach and surf, and the breakwater, and the ocean. In the
wintertime, he and his wife enjoyed watching the rolling surf from
inside their home. He said that all he could see now, while seated
on the deck, "is a wall of sand," not "one iota of beach," and even
standing up the view is only of water.

The jury inspected firsthand the view from the Karans' home
and decks before deliberating.

The trial court charged the jury that the Karans were entitled
to "just compensation" for the easement acquired by the Borough
"measured by the difference between the fair market value of the
entire property on November 7th, 2008 immediately before the
taking and the fair market value of the remaining property on
November 7th, 2008 immediately after" the taking. The court
explained that "fair market value of a property is the amount that
a willing buyer and a willing seller would agree upon through
arm's length voluntary negotiations" based on "all surrounding
circumstances," including "all the features that enhanced the value
of the property" as well as those "that diminished its value."
However, the court advised the jury to disregard, in valuing the
Karans' remainder property, any general benefit flowing from the
public project. To that end, the court gave this additional instruc-
tion:

> In determining the value of the [Karans'] property remaining after the Borough's
> taking of the easement[,] you may not consider general benefits produced by the
> dune project which [the Karans] may enjoy in common with other property owners
> in the area to reduce the value. In other words, the Borough is not entitled to any
> credit nor should the amount of just compensation to the Karans be reduced by
> virtue of any general benefit which they may receive along with other property
> owners in the Borough as a result of the dune and beach replenishment project.[5]

---

[5] The trial court's instructions generally mirrored the model jury charges for a
condemnation case, see, e.g., Model Jury Charge (Civil), § 9.14 "Condemnation—
Partial Taking" (April, 1996), with one significant exception. There is no model

The jury returned an award of $375,000 as compensation for the easement and for any damages to the remainder of the Karans' property.

The court denied the Borough's motion for a new trial and, in the alternative, a remittitur. The court held to its earlier expressed view that general benefits—the benefits accruing from the storm-protection project—were not admissible to offset the property's reduced value from the obstructed ocean view, and also concluded that the jury probably discounted Dr. Molliver's testimony because—despite his credentials—he never witnessed the view from the Karans' deck.

## II.

The Appellate Division affirmed. The appellate panel agreed with the trial court that the storm protection afforded to the Karans' property by the dune-construction project could not be considered by a jury to decrease the Karans' compensation award for the partial taking of their property and the diminished ocean view from their house. *Harvey Cedars, supra,* 425 *N.J.Super.* at 165–68, 40 *A.*3d 75. The panel reasoned that the advantage accruing to the Karans from the newly constructed dune was not a special benefit but rather "a classic example of a general benefit," which cannot be used to offset the loss from a partial taking. *Id.* at 166, 40 *A.*3d 75. The panel explained, " '[g]eneral benefits are those produced by the improvement which a property owner may enjoy in the future in common with all other property owners in the area,' " *id.* at 165, 40 *A.*3d 75 (quoting *State v. Interpace Corp.,* 130 *N.J.Super.* 322, 330–31, 327 *A.*2d 225 (App.Div.1974)), whereas special benefits are those that " 'differ in kind, rather than in degree, from the benefits which are shared by the public at large,' " *id.* at 166, 40 *A.*3d 75 (quoting 3–8A Nichols, *supra,* § 8A.02).

---

jury charge concerning the application of general and special benefits in partial-takings cases.

With that distinction in mind, the panel determined that the benefit conferred on the Karans' property was a general benefit because "added protection from damage due to storms [ ] was the object of the dune project, was not different in kind from the benefit conferred on the island as a whole, and was only potentially different in degree from the benefit conferred on properties located further inland." *Id.* at 167, 40 *A.*3d 75. According to the panel, the public project did not confer a special benefit on the Karans' property because it "did not permit any new or more lucrative use of the property" or " 'directly increase the value of the particular tract.' " *Ibid.* (quoting *Sullivan, supra,* 51 *N.J.L.* at 540, 18 *A.* 689). Last, the panel noted that the Borough failed to "present any expert testimony that a prospective buyer would be willing to pay the same price for a house with a largely-obstructed view of the ocean as for a house with a magnificent panoramic view, because the former house was safer from storm damage." *Ibid.* (citations omitted). Thus, the panel upheld the jury's award of $375,000 as just compensation for the Borough's acquisition of the easement. *Id.* at 170, 40 *A.*3d 75.[6]

We granted the Borough's petition for certification. *Borough of Harvey Cedars v. Karan,* 210 *N.J.* 478, 45 *A.*3d 983 (2012). We also granted the motions of the Attorney General and The Jersey Shore Partnership to participate as amici curiae.

### III.

The Borough argues that the jury should have been "permitted to consider evidence of the distinct and measurable protective *special benefit* " afforded to the Karans from the publicly financed storm-protection project—"[e]vidence a willing buyer and willing seller ... would have considered in their determination of fair value" of the Karans' property after acquisition of the easement.

---

6 Our discussion of the Appellate Division decision is limited to the issue of the application of general and special benefits in condemnation cases—the issue on which we granted certification.

(Emphasis added). The Borough stresses that the storm protection provided to oceanfront homes is unique, and different in kind, from that provided to other area homes because "only oceanfront owners ... receive the direct, special benefit of protection from the cumulative effect of on-going erosion and smaller storms that occur on a more regular basis."

The Borough asserts that the Appellate Division and trial court reached the anomalous result of allowing "evidence of the asserted negative impact" of the dune project on the Karans' home while barring evidence of "the unique, positive impact of the very same [p]roject" on the same property. The Borough also argues that whether the dune project conferred a special benefit on the Karans' property was a jury issue. It submits that, based on this Court's reasoning in *State v. Gorga*, 26 *N.J.* 113, 138 *A.*2d 833 (1958) and *State v. Caoili*, 135 *N.J.* 252, 639 *A.*2d 275 (1994), "the gate keeping function of the trial court is to determine if evidence is reliable and not speculative, and once determined to be reliable, it is for the jury to determine what, if any, impact the evidence presented has on just compensation." The Borough faults the trial court for "wad[ing] into the jury's territory in reaching the ultimate conclusion that the evidence did not present a special benefit."

Amicus, the Attorney General, advocates for a fair market value approach to the just-compensation determination in condemnation cases. In the Attorney General's view, a general benefit is one that is "speculative or uncertain" or one that "indirectly and equally affects all landowners in a community," and therefore "cannot be set off from a condemnation award." On the other hand, a special benefit that confers "quantifiable benefits" in direct physical relation to a public project and that " 'admits of reasonable computation' " may be considered in determining a condemnation award, citing *Mangles v. Hudson Cnty. Bd. of Chosen Freeholders*, 55 *N.J.L.* 88, 92, 25 *A.* 322 (Sup.Ct.1892). By that standard, the Attorney General finds that the dune project provides both general and special benefits to the Karans' property.

According to the Attorney General, "benefits that are indirect, speculative, [and], shared equally by the whole community," i.e., "increased commerce and population to the locality," are general benefits. Benefits that are "readily quantified, and not equally shared by the entire community," such as the sheltering protection from storm damage afforded to the Karans' property, are special benefits. The Attorney General submits that a condemnation award should not be "decoupled from the ascertainable change to fair market value" resulting from a public project. He also suggests that the time may have come to discard the special- and general-benefits terminology for a simple, fair-market rule " 'permitting offset of all reasonably certain, immediate and nonspeculative benefits,' " quoting *Los Angeles Cnty. Metro. Transp. Auth. v. Cont'l Dev. Corp.*, 16 *Cal.*4th 694, 66 *Cal.Rptr.*2d 630, 941 *P.*2d 809, 824 (1997).

Amicus, The Jersey Shore Partnership, also encourages this Court to adopt a fair market value approach to ascertaining the amount of a condemnation award when the remaining property—after a partial taking—directly and quantifiably benefits from a public project. The Partnership states that the law has become "mired in technical, nonsensical arguments" over the meaning of general and special benefits and proposes that the test should be whether the benefits, however characterized, are ascertainable and directly enhance the remaining property. The Partnership asserts that the engineered dunes, financed at public expense, provide a distinct, unique, and quantifiable benefit to oceanfront homes because they spare those homes from "total destruction ... from the power of the ocean's waves."

The Karans urge this Court to affirm the Appellate Division and maintain our long-standing, common-law distinctions between general and special benefits. According to the Karans, the prohibition against the use of general benefits from a public project as an offset to a condemnation award in a partial-takings case flows directly from the language both in *Sullivan*, *supra*, 51 *N.J.L.* at 540, 18 *A.* 689, and *Village of Ridgewood v. Sreel Investment*

*Corp.,* 28 *N.J.* 121, 131–32, 145 *A.*2d 306 (1958). Thus, from the Karans' perspective, the general storm-protection benefits from the publicly financed construction of dunes present "[n]o advantage ... that would not in greater or less degree be enjoyed by the entire neighborhood," quoting *Sullivan, supra,* 51 *N.J.L.* at 540, 18 *A.* 689. Stated differently, the Karans are enjoying benefits "in common with all other property owners in the neighborhood as a result of the [public project]," quoting *Sreel, supra,* 28 *N.J.* at 131, 145 *A.*2d 306. In short, the Karans insist that they should not have to pay for the benefits of a public project when their neighbors do not. The Karans claim that the benefits they received are not special benefits as described in *Sullivan* because they are not receiving an "advantage from the public project over and above that given to other properties in the neighborhood," citing *Sullivan, supra,* 51 *N.J.L.* at 540–41, 18 *A.* 689. Moreover, they argue that the benefit conferred is the one that was intended by the project—the one that all property owners in Harvey Cedars are enjoying in common.

The Karans also argue that the trial court properly made the threshold-admissibility determination that the dune-construction project was a general benefit and therefore not a legally cognizable basis for decreasing a condemnation award. Thus, they contend that only when the court first rules that the benefits conferred by a public project are "special" may a jury consider whether the project financially increases the value of the remaining property in a partial-takings case.

IV.

The question before us solely concerns an issue of law—how to compute "just compensation" in a partial-takings case. Because our standard of review is de novo, we owe no deference to the legal conclusions reached by the trial court and Appellate Division. *See Manalapan Realty, L.P. v. Twp. Comm. of Manalapan,* 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995) (noting that "interpretation of

the law and the legal consequences that flow from established facts are not entitled to any special deference").

## A.

We begin with some basic principles of law governing the case before us. The right to "just compensation" when the government takes property for a public use is one of the essential guarantees of both the United States and New Jersey Constitutions. *U.S. Const.* amend. V ("[N]or shall private property be taken for public use, without just compensation."); *N.J. Const.* art. I, ¶ 20 ("Private property shall not be taken for public use without just compensation."). This fundamental right is of ancient origin, predating the founding of our Republic, and is found even in the text of the Magna Carta. *Magna Carta* ch. 28 (1215), *reprinted in The Anglo–American Legal Heritage* 84 (Daniel R. Coquillette, 2d ed. 2004) ("No constable or other bailiff of ours shall take grain or other chattels of any one without immediate payment therefor in money . . . .");[7] *see also* 1 William Blackstone *Commentaries on the Laws of England* \*134–35 (1765) (explaining that an individual's private property cannot be taken "for the general good of the whole community" without "giving him a full indemnification and equivalent for the injury thereby sustained").

Our State Constitution also specifically guarantees "just compensation" for a municipality's taking of an easement on private property for a public use. *N.J. Const.* art. IV, § 6, ¶ 3 ("Any agency or political subdivision of the State . . . may be authorized by law to take or otherwise acquire . . . easements upon . . . property to preserve and protect the public . . . place, improvement, or use; but such taking shall be with just compensation."). The Eminent Domain Act, *N.J.S.A.* 20:3–1 to 50, also makes clear that in the case of a partial taking of property, such as the

---

[7] The right to just compensation began with grain, but "as eminent domain shifted from the Crown to Parliament, compensation began to be offered for land." William A. Fischel, *Regulatory Takings: Law, Economics, and Politics* 78 (1995).

acquisition of an easement by a municipality, a landowner is entitled to compensation not only for the property taken but also for "damages, if any, to any remaining property." *N.J.S.A.* 20:3-29.

When an entire piece of property is acquired by the State or a municipality by the power of eminent domain, the landowner is entitled to just compensation measured by "the fair market value of the property as of the date of the taking, determined by what a willing buyer and a willing seller would agree to, neither being under any compulsion to act." *State v. Silver,* 92 *N.J.* 507, 513, 457 *A.*2d 463 (1983) (internal citations omitted); *see also Caoili, supra,* 135 *N.J.* at 260, 639 *A.*2d 275 (same). The landowner whose property is taken in its entirety for a public use is not entitled to enhanced compensation because the taking will benefit his neighbors or increase the value of their homes. *See Continental, supra,* 66 *Cal.Rptr.*2d 630, 941 *P.*2d at 824. Had Harvey Cedars taken the whole of the Karans' property for the construction of a dune, no one would argue that—because of the future benefits that their neighbors would enjoy from the public project—the Karans would be entitled to more than the fair market value of their property, 1.9 million dollars.

However, our partial-takings jurisprudence, from its earliest beginnings, has not necessarily reflected the straightforward fair market value approach that is evident in total-takings cases. To find the source of the special/general benefits dichotomy, we must look back, understanding that "a page of history is" sometimes "worth a volume of logic." *New York Trust Co. v. Eisner,* 256 *U.S.* 345, 349, 41 *S.Ct.* 506, 507, 65 *L.Ed.* 963, 983 (1921).

### B.

In our early common law, when part of a landowner's property was taken for a public project, the benefits conferred on the remainder property could not be used to offset his loss or damages by the taking. *See* 2 *Nichols, supra,* § 246 at 761 (Matthew Bender, 2d ed. 1917). Indeed, compensation had to be paid in

money for the taking of property. *Carson v. Coleman,* 11 *N.J. Eq.* 106, 108 (Ch. 1856). The common-law rule found expression in two New Jersey cases from this period.

In *State v. Miller,* private property was taken for the construction of a road pursuant to legislation, an "[A]ct," which required a payment of damages to the landowner but which did not provide for the consideration of "benefits or advantages" accruing to the landowner. 23 *N.J.L.* 383, 384–85 (Sup.Ct.1852). In light of the Act's silence on the consideration of benefits, the Supreme Court held that the calculation of an award to the landowner did not require deducting the road's benefits from the value of the loss of the property. *Id.* at 385. The Court observed that "there is no reason why the man whose land is occupied by a public highway should be made to contribute more for the public and common benefit than his neighbor, whose lands are not occupied, but who is equally benefited by the improvement." *Ibid.*

In *Carson, supra,* the Legislature appointed certain individuals to cut a creek through private property but made no allowance for *"first* making just compensation." 11 *N.J. Eq.* at 108. The Chancellor held that when "private property is taken by virtue of the authority of the sovereign power, compensation shall be made *in money"* and that payment for the property shall be made before the taking of the property. *Ibid.* The Chancellor rejected the notion that the "compensation" contemplated by the Constitution could include benefits to the landowner accruing from the project. *Ibid.* The Chancellor expressed the fear that any other approach might lead to legislation that "substitute[s] an *imaginary benefit* for that just compensation" intended by the Constitution. *Ibid.* (emphasis added).

*Carson* articulated a concern that speculative benefits from a public project should not be a device to offset the loss from a partial taking of property. *Miller, supra,* suggested that legislatures were free to enact statutes allowing certain offsets. 23 *N.J.L.* at 384. In time, courts would construe the Constitution's "just compensation" clause to allow the deduction of non-specula-

tive benefits to reduce a condemnation award. *See Mangles, supra*, 55 *N.J.L.* at 91–92, 25 *A.* 322.

## C.

With the expansion of roads and the laying of tracks for railroads that stitched together far-flung communities and states into a nation during the nineteenth century, the pressing question remained whether a landowner's loss from the partial taking of property could be offset by the benefits received from a public project. *See generally* John F. Stover, *American Railroads* 2–8 (2d ed.1997) (discussing wave of internal improvements in Nineteenth Century); Fischel, *supra*, at 80–84 (discussing the "benefit-offset problem" raised by railroad construction). The landowner whose property was partially taken to accommodate the roads and railroad tracks was unquestionably entitled to just compensation. However, railroads argued that the benefits from increased population and commerce through its transportation network made the remainder property more valuable. *See* Fischel, *supra*, at 81 (quoting Harry N. Scheiber, *The Road to Munn: Eminent Domain and the Concept of Public Purpose in the State Courts, Perspectives in American History* 5: 329–402 (1971)) ("As a result of the aggressive use of the benefit offset . . . 'in Illinois, railroad takings frequently resulted in assessment of damages of one dollar.' "). During this period, "railroad companies frequently would take a portion of a landowner's tract and . . . would deem the benefit to the remainder property to exceed the fair value of the part taken, and thus would offer no monetary compensation for the taking." *Continental, supra*, 66 *Cal.Rptr.*2d 630, 941 *P.*2d at 816.

It is within this setting that the doctrine of general and special benefits appears to have emerged in partial-takings cases. Courts declared that general benefits could not be used to offset the loss or damages incurred by the landowner whose property was partially taken. *See, e.g., Sullivan, supra*, 51 *N.J.L.* at 541, 18 *A.* 689.

But exactly what constitutes a general benefit is an issue that has bedeviled our jurisprudence.

### D.

The consideration of general and special benefits conferred on a landowner in the case of a partial taking of property for a public improvement was addressed in New Jersey in *Sullivan, supra,* 51 *N.J.L.* 518, 18 *A.* 689. In that case, the North Hudson County Railroad Company was given an easement to build an elevated railroad on a street in front of apartment houses. *Id.* at 538–39, 18 *A.* 689. The railroad argued that the benefits to the property owner had to be offset against his damages. *Id.* at 540, 18 *A.* 689. Justice Dixon, speaking for the Court of Errors and Appeals, held that only special benefits, not general benefits, could be deducted from the landowner's damages. *Id.* at 538, 541, 18 *A.* 689. Justice Dixon stated that the general benefits of a railroad operating across an owner's land are "those which affect the whole community or neighborhood, by increasing the facility of transportation, attracting population, and the like." *Id.* at 540, 18 *A.* 689. Those benefits are not deducted from a landowner's damages because they would "in greater or less degree be enjoyed by the entire neighborhood." *Ibid.* On the other hand, "special benefits" were described as "those which directly increase the value of the particular tract crossed." *Ibid.* Examples of special benefits that might be conferred by the construction of railroad tracks on a piece of property were the draining of a swamp, the building of an embankment to "maintain a mill pond," or the erecting of a bridge "afford[ing] a better way between portions" of a landowner's property. *Ibid.* Justice Dixon found no special benefit extending to the apartment houses situated in front of the elevated railroad. *Ibid.*

Three years after *Sullivan,* Justice Dixon in *Mangles, supra,* 55 *N.J.L.* at 91, 25 *A.* 322, had the opportunity to revisit and refine his discussion of general and special benefits in the context of the constitutional standard of "just compensation." *Mangles* involved

the widening of a public highway that required the taking of part of several landowners' properties. *Id.* at 89–90, 25 *A.* 322. This time, speaking for the Supreme Court, Justice Dixon looked to the meaning of "the constitutional term 'just compensation' " in a partial-takings case. *Id.* at 91, 25 *A.* 322. Justice Dixon determined that "just compensation" could not "be ascertained without considering all the proximate effects of the taking." *Id.* at 92, 25 *A.* 322. In determining "just compensation," he made clear that "the benefit immediately accruing" to the remainder property from a public project may offset both the "value of the land taken" and "the damage" caused to the remainder. *Ibid.*

Justice Dixon maintained that the "possibility" of a benefit accruing from a public use—"like the opening of highways"—could not be considered in reducing a landowner's award from the loss of property. *Ibid.* In essence, he barred speculative benefits from any consideration in a just-compensation determination. *Ibid.* Accordingly, a benefit that is not given any weight in a just-compensation calculus is one that might arise "in the indefinite future" or one that "is so uncertain in character as to be incapable of present estimation." *Ibid.* Such a benefit "may spring from the growth of population" as the result of a public improvement and "is usually styled general benefit, because it affects the whole community or neighborhood." *Ibid.* In contrast, "any benefit" arising from the taking and public use of the property "which admits of reasonable computation [ ] may enter into the award." *Ibid.* In *Mangles,* the increased value of the land abutting the road was not a general benefit and therefore could be deducted from the compensation award if it sprung from "the benefit immediately arising from the mere existence of the road." *Id.* at 94–95, 25 *A.* 322. The Supreme Court affirmed the deduction of benefits from the value of the lands taken and the damages caused to the remainder properties. *Id.* at 96, 25 *A.* 322.

It is fair to conclude that Justice Dixon intended *Mangles* as a refinement of his discussion of special and general benefits in *Sullivan.* He clearly expected that benefits emanating from a

public project that enhanced the value of the remainder property in a partial-takings case—benefits that were non-speculative and reasonably calculable at the time of the taking—would be weighed in fixing an award of just compensation. *Id.* at 92, 25 *A.* 322.

### E.

In 1896, in *Bauman v. Ross,* the United States Supreme Court quoted approvingly from *Mangles* and seemingly adopted the standard articulated by Justice Dixon for determining just compensation in a partial-takings case. 167 *U.S.* 548, 584, 578–79, 17 *S.Ct.* 966, 980, 978, 42 *L.Ed.* 270, 286, 284–85 (1897). The Court noted in *Bauman* that "[t]he Constitution of the United States contains no express prohibition against considering benefits in estimating the just compensation to be paid for private property. . . ." *Id.* at 584, 17 *S.Ct.* at 980, 42 *L.Ed.* at 286. The Court further stated—echoing *Mangles*—that a statutorily authorized tribunal could consider "any special and direct benefits, capable of present estimate and reasonable computation," resulting from a public improvement, for the purpose of offsetting "the value of the part taken, or for any injury to the rest." *Ibid.* Thus, "just compensation" is "measured by the loss caused" by the taking: "He is entitled to receive the value of what he has been deprived of, and no more. To award him less would be unjust to him; to award him more would be unjust to the public." *Id.* at 574, 17 *S.Ct.* at 976, 42 *L.Ed.* at 283.

*McCoy v. Union Elevated Railroad Co.,* another partial-takings case, followed the principles of *Bauman* and *Mangles.* 247 *U.S.* 354, 38 *S.Ct.* 504, 62 *L.Ed.* 1156 (1917). There, the Court held that, in considering damages to the remainder property, "allowance should be made for peculiar and individual benefits conferred upon" the remainder from a public improvement. *Id.* at 366, 38 *S.Ct.* at 508, 62 *L.Ed.* at 1166. In *McCoy,* the Supreme Court pronounced that a landowner does not "suffer[ ] deprivation of any fundamental right when a state," in fixing just compensation for a partial taking, "permits consideration of actual benefits—enhance-

ment in market value—flowing directly from a public work, although all in the neighborhood receive like advantages." *Ibid.*

### F.

The principles enunciated in *Mangles, Bauman,* and *McCoy* are simple enough. However, in partial-takings cases, our courts have often used the shorthand terms general and special benefits in differing ways—and sometimes in ways that have obscured or confused those principles. Several examples will suffice to illustrate this point.

In *Sreel, supra,* a municipality condemned a part of a business's property to devote to a public parking lot. 28 *N.J.* at 123–24, 145 *A.*2d 306. This Court found that the trial court erred in allowing the municipality's expert to testify that "benefits will accrue to adjoining property owners from the creation and maintenance of a municipal owned parking lot." *Id.* at 131, 145 *A.*2d 306. Despite citing *Mangles,* the Court did not address whether any benefit arising from the construction of the public parking lot was one "immediately accruing" to the business, non-conjectural, and susceptible of "reasonable computation." *See Mangles, supra,* 55 *N.J.L.* at 92, 25 *A.* 322. The Court merely observed that "our cases have uniformly held that general benefits may not be considered to reduce the damages which an individual property owner will sustain from the taking of a portion of his property." *Id.* at 131, 25 *A.* 322. *Sreel* did not attempt any detailed definition of general benefits. Instead, it fell back on language from the 1852 decision in *Miller,* which stated that no person whose land is taken for a public improvement should pay more than his neighbors for benefits shared in common. *Id.* at 131–32, 25 *A.* 322 (citing *Miller, supra,* 23 *N.J.L.* at 383). *Sreel's* limited analysis never addressed whether the business subject to the partial taking realized an "actual benefit" that resulted in an increase of the market value of the business.

In *Interpace, supra,* a parcel of a landowner's property was taken for the construction of a highway. 130 *N.J.Super.* at 330–

31, 327 *A*.2d 225. The court stated that "[g]eneral benefits may not be considered to reduce the compensation" owed to a landowner for a partial taking of his property. *Id.* at 331, 327 *A*.2d 225. General benefits were defined as "those produced by the improvement which a property owner *may enjoy in the future* in common with all other property owners in the area." *Id.* at 330, 327 *A*.2d 225 (emphasis added). In *Interpace*, the Appellate Division construed general benefits consistent with the principles in *Mangles*, which disallowed benefits that may arise "in the indefinite future." *See Interpace, supra,* 130 *N.J.Super.* at 330, 327 *A*.2d 225; *Mangles, supra,* 55 *N.J.L.* at 92, 25 *A*. 322.

However, in *New Jersey Turnpike Authority v. Herrontown Woods, Inc.,* 145 *N.J.Super.* 279, 286, 367 *A*.2d 893 (App.Div.1976), *certif. granted,* 74 *N.J.* 247, 377 *A*.2d 653 (1977), *certif. dismissed,* 75 *N.J.* 593, 384 *A*.2d 823 (1978), using the special/general benefits dichotomy, the appellate panel reached a result inconsistent with *Mangles'* principles. *Herrontown* involved the partial taking of property as part of a highway construction project. *Id.* at 281, 367 *A*.2d 893. The Turnpike Authority's expert testified that an "overpass specifically benefitted the subject property and its near neighbors," enhancing the values of those properties. *Id.* at 285, 367 *A*.2d 893. Without mentioning *Mangles,* the Appellate Division focused on language in *Sullivan* defining benefits deductible from a landowner's compensation award—special benefits—as " 'an advantage likely to accrue to [the remaining] property over and above the advantages to other property in that vicinity.' " *Id.* at 286, 18 *A*. 689 (quoting *Sullivan, supra,* 51 *N.J.L.* at 525, 18 *A*. 689). Because the Appellate Division found "no special benefit or special advantage to the subject property over and above that which is conferred upon property owners in the general area," the overpass's benefits, in effect, were deemed general benefits and could not be used to offset damages to the landowner's remaining property. *Id.* at 286, 18 *A*. 689.

Significantly, the *Herrontown* court did not disallow the deduction of benefits to the landowner because they were speculative,

arising in the indefinite future, or not susceptible to reasonable calculation. They were disallowed only because the benefits—although apparently calculable—were enjoyed in common with other property owners. *Ibid.* The reasoning in *Herrontown* was essentially adopted by the Appellate Division in the present case.

The use of special and general benefits in both *Herrontown* and the Appellate Division's opinion here is at odds with basic principles of computing just compensation as set forth in *Mangles, Bauman,* and *McCoy.*

## G.

The task of distinguishing between special and general benefits—as defined by case law in New Jersey and other jurisdictions—is difficult "even for trained legal minds." *See* 3-A *Nichols, supra,* § 8A.02[4][a] (Matthew Bender, 3d ed. 2013) (citing *State ex. rel. State Highway Comm'n v. Gatson,* 617 *S.W.*2d 80 (Mo.Ct.App.1981)); *see also Daniels v. State Rd. Dep't,* 170 *So.*2d 846, 854 (Fla.1964) ("As to this distinction, it has been said that more rules, different from and inconsistent with each other, have been laid down on this point than upon any other point in the law of eminent domain."). *See, e.g., State Highway Comm'n v. Emry,* 90 *S.D.* 587, 244 *N.W.*2d 91, 96 (1976) ("[F]or benefits to be deemed special, the benefit to the remaining property must be different in kind from that of any other owner involved in the [ ] improvement and ... it is not the degree of benefit that controls."); *contra Gradison v. State,* 260 *Ind.* 688, 300 *N.E.*2d 67, 74 (1973) (holding "if the benefits to a particular affected owner were *substantially greater in degree* than those accruing to the other landowners in the community, he will be held chargeable with the excess benefits he enjoys, as an offset to his damages.").

Today, the terms special and general benefits do more to obscure than illuminate the basic principles governing the computation of just compensation in eminent domain cases. The problem with the term "general benefits" is that it may mean different things to different courts. To some courts, the term "general

benefits" is a surrogate for speculative or conjectural benefits. *See Mangles, supra,* 55 *N.J.L.* at 92, 25 *A.* 322. To other courts, general benefits are any benefits shared in common with a land-owner's neighbors or community. *See Harvey Cedars, supra,* 425 *N.J.Super.* at 165, 40 *A.*3d 75 (citing *Herrontown, supra,* 145 *N.J.Super.* at 286, 367 *A.*2d 893).

 The fair-market considerations that inform computing just compensation in partial-takings cases should be no different than in total-takings cases. They are the considerations that a willing buyer and a willing seller would weigh in coming to an agreement on the property's value at the time of the taking and after the taking. *See Silver, supra,* 92 *N.J.* at 513, 457 *A.*2d 463; *Vill. of S. Orange v. Alden Corp.,* 71 *N.J.* 362, 368, 365 *A.*2d 469 (1976). In weighing the impact of a public project on the remainder property in a partial-takings case, a willing buyer and willing seller would likely consider benefits to the remainder that are not speculative or conjectural and that are not projected into the indefinite future. Our courts already perform the gatekeeping role of shielding the jury from speculative evidence in valuing just compensation in condemnation cases. For example, our courts do not permit the mere possibility of a zoning change to go before a jury in considering the highest and best use of property taken by eminent domain. *Caoili, supra,* 135 *N.J.* at 264, 639 *A.*2d 275 (explaining that trial judges can reduce the risk of exposing jurors to "unsound and speculative determinations concerning fair market value" "by performing, in effect, a gatekeeping function by screening out potentially unreliable evidence"); *Gorga, supra,* 26 *N.J.* at 116–17, 138 *A.*2d 833 (acknowledging "opportunity for unbridled speculation" and noting that whether evidence of probability of future zoning change warrants submission to the jury "is in the first instance a question for the court as in the case of any other issue of fact" (citations omitted)).

 In short, just compensation should be based on non-conjectural and quantifiable benefits, benefits that are capable of reasonable calculation at the time of the taking. *See Mangles,*

*supra,* 55 *N.J.L.* at 92, 25 *A.* 322. Speculative benefits projected into the indefinite future should not be considered. *See ibid.* Benefits that both a willing buyer and willing seller would agree enhance the value of property should be considered in determining just compensation, *see ibid.; McCoy, supra,* 247 *U.S.* at 366, 38 *S.Ct.* at 508, 62 *L.Ed.* at 1166, whether those benefits are categorized as special or general.

We need not pay slavish homage to labels that have outlived their usefulness. California has cast aside the special/general benefits terminology in favor of a straightforward fair market value approach. In *Continental, supra,* the California Supreme Court explained that the rationale for the general and special benefits distinction no longer had support in contemporary just-compensation jurisprudence. 66 *Cal.Rptr.*2d 630, 941 *P.*2d at 823–24. Moreover, it found that the "difficulties inherent in the courts' efforts consistently to apply the distinction" warranted overruling the special/general benefits paradigm. *Id.* 66 *Cal.Rptr.*2d 630, 941 *P.*2d at 812. As such, the court overruled its prior decision in *Beveridge v. Lewis,* 137 *Cal.* 619, 70 *P.* 1083 (1902), "to the extent it holds that only 'special' benefits may be offset against severance damages." *Id.* 66 *Cal.Rptr.*2d 630, 941 *P.*2d at 824.

Furthermore, the California Supreme Court reasoned that "[a] rule permitting offset of all reasonably certain, immediate and nonspeculative benefits has the virtue of treating benefits and severance damages evenhandedly." *Ibid.* In accord with that approach, the Court adopted the following rule: "in determining a landowner's entitlement to severance damages, the fact finder henceforth shall consider competent evidence relevant to any conditions caused by the project that affect the remainder property's fair market value, insofar as such evidence is neither conjectural nor speculative." *Ibid.*

In many ways, *Continental* is a modern-day version of the decision in *Mangles* and is consistent with the approach we take today.

## V.

We find that the Appellate Division's use of the general-benefits doctrine in this case is at odds with contemporary principles of just-compensation jurisprudence. The jury was barred from hearing evidence about potentially quantifiable benefits arising from the storm-protection project that increased the value of the Karans' home. Just compensation does not entitle a landowner to a windfall from a partial taking of property. *Bauman, supra,* 167 *U.S.* at 574, 17 *S.Ct.* at 976, 42 *L.Ed.* at 283.

Harvey Cedars condemned a portion of the seaside, oceanfront property of the Karans to acquire a permanent easement for the construction and maintenance of a twenty-two-foot dune to replace an existing sixteen-foot dune. The new dune was part of a much larger shore-protection project to benefit all the residents of Harvey Cedars and Long Beach Island. Unquestionably, the benefits of the dune project extended not only to the Karans but also to their neighbors further from the shoreline. Yet, clearly the properties most vulnerable to dramatic ocean surges and larger storms are frontline properties, such as the Karans'. Therefore, the Karans benefitted to a greater degree than their westward neighbors. Without the dune, the probability of serious damage or destruction to the Karans' property increased dramatically over a thirty-year period.

A jury evidently concluded that the Karans' property decreased in value as a result of the loss of their panoramic view of the seashore due to the height of the dune. A willing purchaser of beachfront property would obviously value the view and proximity to the ocean. But it is also likely that a rational purchaser would place a value on a protective barrier that shielded his property from partial or total destruction. Whatever weight might be given that consideration, surely, it would be one part of the equation in determining fair market value. Although, in determining the fair market value of the Karans' property, the jury was instructed to consider all features that enhanced and diminished the property's value, the jury also was told to disregard "general benefits pro-

duced by the dune project which [the Karans] may enjoy in common with other property owners in the area to reduce the value." This charge distorted the fair-market valuation of the property by artificially withholding a key component of the analysis.

Thus, the jury was allowed to hear testimony that the dune obstructed the Karans' view of the seashore, decreasing the value of their home, but not the testimony that the dune provided significant storm protection, possibly increasing the value of their home. The trial court and Appellate Division justified this incongruous result by focusing on language in *Sullivan* indicating that general benefits enjoyed by the entire community to some lesser or greater extent are not set off from a compensation award. *See Harvey Cedars, supra,* 425 *N.J.Super.* at 166, 40 *A.*3d 75 (quoting *Sullivan, supra,* 51 *N.J.L.* at 540, 18 *A.* 689). But even in *Sullivan, supra,* the Court of Errors and Appeals spoke of general benefits as those that increase "the facility of transportation, attracting population, and the like," seemingly speculative benefits that are not readily calculable. 51 *N.J.L.* at 540, 18 *A.* 689. The Appellate Division did not place significant weight on the analysis in *Mangles,* which followed *Sullivan,* or attempt to harmonize the two opinions that shared a common author.

The Karans argue that they should not be made to pay twice for storm-damage protection afforded by a public project, once by their taxes and again by deducting the enhanced value of their home from the damages. However, that argument is far-fetched when the actual numbers are considered. The Harvey Cedars shore-protection project cost twenty-five million dollars, with the federal government bearing most of the cost, with the State bearing a lesser amount, and with the municipality pitching in one million dollars. Tens of millions of taxpayers contributed to the shore-protection project that shields the Karans' property from destruction. Because the Karans occupy frontline ocean property, the benefits afforded to them are much greater than to others. The portion of the Karans' taxes that goes to support the project

may be infinitesimal compared to the value added to their home by the dune protection. Of course that value—whatever it may be—is ultimately a jury issue. If one accepted the Karans' argument, it would be permissible for landowners to receive a jury award of $375,000 for a dune's obstruction of their oceanfront view without having to offset any amount if the dune hypothetically increased the value of their home by the same $375,000.

In *Sullivan, supra,* the trial judge raised the following rhetorical question: "If a man can sell his property for more after than before, how can he be injured? How can he be damaged, if the alleged source of harm enures directly to his pecuniary advantage?" 51 *N.J.L.* at 543, 18 *A.* 689. The answer to that question, in light of *Mangles, Bauman,* and *McCoy,* is that a landowner does not suffer a loss if a public project increases the fair market value of the property. The Karans could not receive a financial windfall—an award above fair market value—if the entirety of their property were taken to build the dune, regardless of the positive benefits inuring to their neighbors. It therefore makes little sense that they should profit from a partial taking of their property.

## VI.

The historical reasons that gave rise to the development of the doctrine of general and special benefits no longer have resonance today. We are not dealing with railroads armed with eminent-domain powers taking land to lay tracks and calculating that the property owner is owed nothing because of benefits that may come in the indefinite future from commerce and population growth. Disallowing the deduction of those "benefits" is warranted because "just compensation" must be determined at the time of the taking and must be quantifiable.

Speculative or conjectural benefits conferred on a property owner whose land is partially taken by a public project should not offset a condemnation award because such benefits would not factor into a calculation of fair market value. On the other hand,

reasonably calculable benefits—regardless of whether those benefits are enjoyed to some lesser or greater degree by others in the community—that increase the value of property at the time of the taking should be discounted from the condemnation award.

We cannot devise a perfect means for compensating a property owner whose land is partially taken as part of a public project. We can only ensure that every person will receive just compensation, as promised by our State and Federal Constitutions. Using fair market value as the benchmark is the best method to achieve that result.

Our courts already have used this approach both in total and partial-takings cases. *See, e.g., Silver, supra,* 92 *N.J.* at 513, 457 *A.*2d 463; *Alden, supra,* 71 *N.J.* at 367–68, 365 *A.*2d 469. Awarding "the owner . . . the difference between the fair market value of the property immediately before the taking and the fair market value immediately after the taking" is deeply rooted in our jurisprudence. *Robinson v. Borough of Edgewater,* 98 *N.J.L.* 205, 208, 119 *A.* 7 (E. & A.1922) (citing *Mangles, supra,* 55 *N.J.L.* at 88, 25 *A.* 322). This is known as the "before and after" rule. Under this rule, the damages of the landowner " 'are computed as the difference between the value of the entire tract before the taking and the value of the remainder area after the taking.' " *Alden, supra,* 71 *N.J.* at 367, 365 *A.*2d 469 (quoting 4A Nichols, *supra,* § 14.23 (3d ed. 1975)). Simply stated, the formula is: "[v]alue of entire parcel before taking − value of remainder area after taking = just compensation." *Ibid.* (citing 4A Nichols, *supra,* § 14.23 (3d ed. 1975)).[8]

---

[8] *Alden, supra,* discusses an alternate means for computing damages—the so-called "severance damage rule"—that, in most cases, should yield the same result. *Ibid.* Under this alternate approach

it has been held that the measure of damages is the market value of the land taken plus the difference before and after the taking in market value of the remainder area [expressed as]:

Value of land taken + (value of remainder area before taking − value of remainder after taking) = just compensation.

*Ibid.* (citing 4A Nichols, *supra,* § 14.23 (3d ed. 1975)).

The Borough should not have been barred from presenting all non-speculative, reasonably calculable benefits from the dune project—the kind that a willing purchaser and willing seller would consider in an arm's length transaction. Those benefits are part of the fair-market equation, regardless of whether they are enjoyed by others in the community. The jury in this case should have been charged that the determination of just compensation required calculating the fair market value of the Karans' property immediately before the taking and after the taking (and construction of the twenty-two-foot dune).

The trial court's charge required the jury to disregard even quantifiable storm-protection benefits resulting from the public project that increased the fair market value of the Karans' property. In short, the quantifiable decrease in the value of their property—loss of view—should have been set off by any quantifiable increase in its value—storm-protection benefits. The Karans are entitled to just compensation, a reasonable calculation of any decrease in the fair market value of their property after the taking. They are not entitled to more, and certainly not a windfall at the public's expense.

Because the evidentiary rulings and jury instruction kept from the jury an essential component of the fair-market calculation of just compensation, we must reverse. The Appellate Division points out that Harvey Cedars did not present expert testimony that a prospective buyer would have been willing to pay more for a shorefront home "safer from storm damage," *Harvey Cedars, supra,* 425 *N.J.Super.* at 167, 40 *A.*3d 75. However, the Borough cannot be faulted because the trial court barred such testimony.

---

Nichols, however, warns that "care must be taken to avoid duplication of damage or oversight of damage" when using the "severance damage rule." 4A Nichols, *supra,* § 14.02[2][a][ii] (Matthew Bender, 3d ed. 2013). Notwithstanding *Alden's* laying out two alternative methods of computing "just compensation," courts generally should follow the "before and after" rule, unless the "severance damage rule" provides a more practical approach.

Because the Borough was barred from presenting evidence that is admissible under the standards set forth in this opinion and because the trial court erroneously charged the jury, a new trial must be granted. At that trial, the Borough will have the opportunity to present evidence of any non-speculative, reasonably calculable benefits that inured to the advantage of the Karans' property at the time of the taking.

## VII.

For the reasons expressed, we reverse the judgment of the Appellate Division, vacate the condemnation award, and remand to the trial court for proceedings consistent with this opinion.

*For reversal and remandment*—Justices LaVECCHIA, ALBIN, HOENS, PATTERSON and Judge RODRÍGUEZ (temporarily assigned)—5.

*Opposed*—None.

*Not participating*—Chief Justice RABNER and Judge CUFF (temporarily assigned).